Daniel T. TAYLOR, III, Appellant,

v.

John P. HAYES, Judge, Jefferson Circuit Court, Appellee.

Court of Appeals of Kentucky.

March 23, 1973.

Rehearing Denied June 15, 1973.

---

Daniel T. Taylor, III, Louisville, Robert A. Sedler, Lexington, for appellant.

John P. Hayes, Judge, Jefferson Circuit Court, Louisville, Ed W. Hancock, Atty. Gen., Frankfort, Edwin A. Schroering, Jr., Henry A. Triplett, Louisville, for appellee.

CATINNA, Commissioner.

Daniel T. Taylor, III, appeals from a judgment and order of the Jefferson Circuit Court, Criminal Branch, Second Division, finding him guilty upon eight charges of contempt and committing him to the City of Louisville Jail for a total of three years and five months. He further appeals from an order of the same court prohibiting him from the further practice of law in that particular court because he had been theretofore found guilty of contempt of court.

The charges of contempt against Taylor result from his conduct in the defense of Narvel Tinsley. Narvel Tinsley and his brother, Michael Tinsley, were jointly indicted and charged with the murder of two police officers. The Tinsleys were black men while the police officers were white. The murders created some considerable sensation in Louisville, and feelings in the different communities were very pronounced. The news media tended to publicize each and every phase of the events surrounding the murders, and there was some apparent cooperation on the part of the authorities, as there is mention made of live television coverage of the site where the murders were said to have been committed. A news conference, with television coverage, announced the arrest of the Tinsleys. Later Narvel Tinsley excaped jail, and again newspaper coverage was overly abundant. It was in this situation that the joint trial of Narvel and Michael Tinsley was finally commenced on October 18, 1971.

Daniel Taylor, III, represented Narvel Tinsley while Michael Tinsley was represented by Attorneys Fleming, McCall, and Scott.

The trial lasted from October 18 through October 29, 1971, with Sunday excepted, and it was in the course of this trial that Taylor committed the offenses which were considered contemptuous in nature by the court. The particular acts of contempt as specified by the court in a "Corrected Judgment and Certificate of Contemptuous Action in the Presence of the Trial Court" were as follows:

"Contempt 1. Mr. Taylor, in questioning a prospective juror, on the second day of Voir Dire, repeatedly ignored the Court's order not to continue a certain line of questioning and to ask his questions to the jury as a whole. He evidenced utter disrespect for prospective jurors.

"Contempt 2. The Court sustained the Commonwealth objection on the use of a prior statement to cross examine Officer Hogan and not to go into the escape of Narvel Tinsley. Mr. Taylor repeatedly and completely ignored the Court's ruling.

"Contempt 3. During the playing of a tape recording of the voice of witness David White, Mr. Taylor wrote on a blackboard. After the playing of the tape it was ordered that the blackboard be removed from the Court and Mr. Taylor was advised by the Court that he could use it in his final summation to the jury. Mr. Taylor was disrespectful to

the Court by his tone of voice and manner when he replied, 'I'll certainly keep that in mind, your Honor.'

"Contempt 4. During cross-examination of Narvel Tinsley, by Mr. Schroering, Mr. Taylor interrupted and moved for a recess, was overruled by the Court, and then became most disrespectful to the Court and refused to take his seat at counsel's table as ordered.

"Contempt 5. Complete and utter disrespect by Mr. Taylor in the questioning of Mr. Irvin Foley, an attorney and Legal Advisor to the Louisville Police Department when he continually disobeyed the Court's ruling regarding a press conference which the Court had ruled on unadmissible (sic). Mr. Taylor accused the Court of disallowing admittance of black persons in the Courtroom during the examination of this witness and made a statement in the presence of the jury inferring that only white police officers could enter the courtroom. It has always been the Rule of the Court that there will be no interruption during the examination of a witness or during closing arguments by people coming and going into and from the Courtroom, which rule was known to Mr. Taylor.

"Contempt 6. The witness Jesse Taylor, a Louisville Police Officer, read a statement by witness, David White. A Ruling was made by the Court that the statement spoke for itself, had been introduced in evidence and could not be commented on by Officer Taylor, who merely took the statement. Mr. Taylor continued to disregard the Court's order and ruling by continually reading parts of the statement out of context.

"Contempt 7. Mr. Taylor in examining Mr. Norbert Brown, again referred to a press conference that the Court had previously ordered him not to go into. He also waved his arms at the witness in a derogatory manner indicating the witness was not truthful and showing utter contempt of the Court's ruling.

"Contempt 8. The Court directed Mr. Taylor to call his next witness. He called Lt. Garrett, Louisville Police Department. After this witness was sworn and took the stand, a deputy sheriff advised the Court that Mr. Taylor's aide was not searched, as everyone else had been upon entering the Courtroom. Mr. Taylor ordered the deputy to search his aide. The Court ordered Mr. Taylor to begin his examination, which he refused to do until he was cited for contempt in the Court's chamber.

"Contempt 9. Mr. Taylor repeatedly asked the same question of witness Floyd Miller that the Court had held improper. He was also disrespectful in his tone of voice when referring to a certain police officer as 'this nice police officer.' "

We have examined the entire record of the Tinsley trial, and it becomes immediately apparent that even before the trial had "gotten off the ground, so to speak," Taylor had embarked upon a plan or program designed to disrupt the trial and by any means possible cause the trial court to commit trial errors which might form the basis of an appeal. His actions were such as to clearly illustrate that they were deliberate, delaying, or planned disruptive tactics which did in fact create such an atmosphere in the court that he, if permitted to continue, would have appeared to be the star performer in the center ring of a three-ring circus. He constantly harassed the court by innumerable objections, statements, and requests for conferences in chambers, and, in truth, the record indicates that a great percentage of the trial time was consumed by the court and counsel attending speeches made by Taylor in the court's chambers.

As the trial progressed, there was a constant refusal on the part of Taylor to desist in his arguments, some in the presence of the jury and some at the bench. He refused upon occasions to maintain his seat so that the orderly processes of the court were available to the defendants. He con-

tinuously disregarded the court's orders and directions concerning the examination of jurors or witnesses and persisted in repetitious questioning and argument with both jurors and witnesses. Taylor launched a long tirade seeking to have the court remove opaque screens that had been placed over the windows and doors so as to lend some degree of privacy to the proceedings and protect the participants in the trial from the disconcerting demonstrations which were being conducted in and around the building. Taylor claimed that by the screening of the windows and doors his client was not receiving a public trial. Later, he made a monumental production of the fact that the court was refusing to admit spectators in crowds, claiming that by reason of this policy his client was not receiving a public trial. Again, the clearing of the back two rows of benches in the courtroom following laughter, noise, and other disruptive practices by the spectators was claimed by Taylor to be prejudicial to his client's receiving a fair trial.

There is no necessity of detailing the innumerable acts of Taylor which clearly reflected his contempt for the court as well as the judicial system of this Commonwealth. His actions were such as to place on trial the entire judicial system of the Commonwealth and those judges sworn to uphold its Constitution and laws and thereby assure defendants, a fair, orderly, and speedy trial.

Taylor was overbearing, contemptuous, and obnoxiously persistent in his questions and objections, and his misconduct was such that those attorneys representing Michael Tinsley, claiming that his antics prejudiced the rights of their client, were continually objecting to his tactics and moving the court that a severance be granted. The incidents necessitating objections on the part of Michael Tinsley's attorneys were so persistent and so constant that rather than consume the time of the court in a constant repetition of the rather involved objection and motion, the parties got to the place of calling it "Objection No. 1." We find all through the record this Objection No. 1 made on behalf of Michael Tinsley.

In the light of the entire record this court can only conclude that Daniel Taylor was guilty of each and every contempt as charged by the court, and if the court had so desired there could have been numerous other charges assessed in the course of the trial. In spite of Taylor's contemptuous conduct throughout the trial, we do not find at any point in the record an occasion where Taylor made any personal attack upon the judge, his integrity, or ability. On the contrary, Taylor was polite to the point of almost being condescending. At no time was his conduct of such a nature as to create a personal controversy between him and the court.

Throughout his brief, Taylor complains continuously of the conduct of the judge. He is identified as "an activist seeking combat" and charged with an actual intent on his part to purposely "bait" Taylor beyond the endurance of any lawyer to accept such vilification and abuse. The judge is charged with exercising an "uncontrollable animus" toward Taylor during the entire proceedings and with fighting him on a personal basis because he was attorney for Narvel Tinsley. Taylor's brief says that such charges are grave, and this court agrees with him to the extent of saying that the brief in itself demonstrates something less than complete and total respect for the judicial system of this Commonwealth. Our examination of the record fails to substantiate in the least any of the charges of misconduct on the part of the court that were discussed and complained about in Taylor's brief. In fact, we reach a contrary conclusion, for it seems to us that the court "leaned over backwards" in an effort to assure Narvel Tinsley a fair trial in spite of the misconduct of his attorney.

The contempt citations and the sentences coming at the end of the trial were not and could not have been a surprise to

Taylor, because upon each occasion and immediately following the charged act of contempt the court informed Taylor that he was at that time in contempt of court. All of these acts were committed in open court and made known to Taylor at the time of their commission and, therefore, he cannot now complain that he was unaware of the nature of the charged contempt. Cf. Cooke v. United States, 267 U.S. 517, 45 S.Ct. 390, 69 L.Ed. 767 (1925). The conduct of the judge throughout the trial was motivated by his efforts to maintain order in his courtroom and to see that the trial was properly conducted. The court was never the "activist seeking combat," but rather he appeared to be continuously on the defensive in his effort to contain Taylor to the point where the defendants would be assured a fair trial.

Upon completion of the trial, the case was submitted to the jury which returned verdicts finding each of the Tinsleys guilty and fixing their punishment at death. After the verdicts had been returned, but before the jury was discharged and while it was seated in the jury box, the following proceeding took place:

"THE COURT: Mr. Taylor, the Court has something to take up with you, sir, at this time.

MR. TAYLOR: Well, I'll be right here, Judge.

THE COURT: I've for two weeks sit here and listen to you. Now, you're going to listen to me. Stand right here, sir.

For two weeks I've seen you put on the worst display I've ever seen an attorney in my two years on this court and 15 years of practicing law. You've quoted that you couldn't do it any other way. You know our court system is completely based upon, particularly criminal law, the Doctrine of Reasonable Doubt. That's exactly what it means, reason. It doesn't mean that it's based upon deceit; it doesn't mean that it's based upon trickery; it doesn't mean that it's based upon planned confusion.

Sometimes I wonder really what your motive is, if you're really interested in the justice of your client, or if you have some ulterior motive, if you're interested in Dan Taylor or Narvel Tinsley.

It's a shame that this court has to do something that the Bar Association of this State should have done a long time ago.

As far as a lawyer is concerned, you're not. I want the jury to hear this; I want the law students of this community to hear this, that you're not the rule, you're the exception to the rule—

MR. TAYLOR: (Interrupting) Thank you.

THE COURT: I want them to understand that your actions should not be their actions because this is not the way that a court is conducted. This is not the way an officer of a court should conduct itself."

The court thereupon sentenced Taylor on nine counts of contempt aggregating in all four and one-half years. However, this court permitted the trial judge to file a corrected judgment by which Taylor was sentenced upon eight charges of contempt for a total of three years and five months in jail.

The right of the courts of this Commonwealth to maintain order by punishment for contempt has been a part of our law for a great number of years. In 1882 the right to punish for contempt without the intervention of a jury was recognized as fully established by the rules of the common law and therefore a part of the law of this state. Arnold v. Commonwealth, 80 Ky. 300.

A short time later contempt was defined in these words:

"Civil contempts are those quasi contempts which consist in failing to do

something which the contemnor is ordered by the court to do for the benefit or advantage of another party to the proceeding before the court; while criminal contempts are all acts in disrespect of the court or its process, which obstruct the administration of justice, or tend to bring the court into disrepute." Wages v. Commonwealth, 13 K.L.R. 925 (1892).

An even more recent definition of contempt and one which fits Taylor like a glove is found in United States v. Seale, 7th Cir., 461 F.2d 345 (1972), at page 371, where the court said:

"On the positive side of the obstruction question, failure to heed the directive of the court to desist from arguing, to sit down, or to remain quiet may indeed constitute an actual material obstruction to the administration of justice. The unmistakable implication of In re McConnell, 370 U.S. 230, 235, 236, 82 S. Ct. 1288, 8 L.Ed.2d 434, is that defiance of the court's order to cease questioning would have actually obstructed the proceedings. As governor of the trial, the trial judge must have the authority necessary to ensure the orderly and expeditious progress of the proceedings. His directives in exercise of this authority must be obeyed; otherwise the clear result would be courtroom chaos. Wholly arbitrary limits on argument will, if prejudicial, merit reversal of the substantive case, but that hardly can excuse open defiance of the court's commands. * * * We do not say that automaton-like reflexive obedience to the court's orders is necessary to avoid a contempt citation. The law does not expect unhuman responsiveness. A certain amount of leeway must be allowed. But where the directive is clear, the judge's insistence on obedience is not undercut by his further rejoinder, and the party directed understands what is being asked of him, he must obey. * * *."

Taylor was so conclusively guilty of contempt, committed in open court in the presence of the judge, that under the present laws of this Commonwealth, we would have no difficulty in affirming the judgment of the trial court.

However, Taylor's claim that his rights under the 6th and 14th Amendments to the Constitution of the United States have been violated requires that we re-examine the action of the trial judge upon these points. Taylor claims that the trial judge was so personally involved in controversy with him that he could not impartially sit in judgment on the contempt charge. The Supreme Court has held that a trial judge is disqualified to act on a contempt charge in situations where he has become personally embroiled in the controversy as an "activist seeking combat" or by reason of personal attacks upon the judge which in themselves carry a potential for bias.

In Offutt v. United States, 348 U.S. 11, 75 S.Ct. 11, 99 L.Ed. 11 (1954), a fourteen-day trial was marked by an intermittent continuous wrangle between the trial judge and counsel for one Peckham. The court and Offutt were continuously arguing concerning the admissibility of evidence and the conduct and demeanor of each. The examination of witnesses was characterized by accusations and cross-accusations of the raising of voices, shoutings at one another, the waving of arms, and the making of unseemly gestures, all of which indicated that the court had become embroiled in the trial to the extent of carrying on a running fight with counsel for the defendant. It was really difficult to segregate the individual involvement of counsel and the court.

At the end of the trial the court declared Offutt guilty of contempt in open court and ordered him committed to the jail for a period of ten days. The United States Court of Appeals reduced the term to be served while the Supreme Court reversed the entire conviction. Such was reversed

upon the ground that the trial court had become so deeply involved personally in the trial that his personal animosity toward Offutt was such that he could not impartially judge either the contempt or punishment of Offutt.

This case has been cited time and again for the theory that where a judge becomes personally involved, or is "an activist seeking combat," he is thereby disqualified to act further. We do not find that here the trial court was an "activist seeking combat" with Taylor or otherwise. There is no evidence of personal embroilment or any type of controversy with Taylor. However, Offutt causes some considerable concern because in that case the court, in discharging the jury after the trial, made statements to them concerning Offutt's conduct and disrespectful performance and intimated that he should not be a member of the legal profession. The Supreme Court, in discussing the court's demonstrated bias and lack of impartiality, stated that these remarks made to the jury revealed his feelings toward the lawyer on whom he had to pass sentence.

The statements made in Offutt are somewhat similar to the statements made by Hayes in the presence of the jury and immediately prior to his sentencing Taylor. However, we do not take these statements as clearly demonstrating bias. The court had cited Taylor upon the contempt charges immediately upon his commission of the acts and at no time during the trial had the court made known to the jury that he had cited Taylor for contempt, much less the reasons for such citations. Here the remarks made by the court touching upon Taylor's conduct were more akin to a declaration of a charge against Taylor based upon the judge's observations and not a constitutionally disqualifying prejudgment of guilt.

The other disqualifying situation involves those events where the trial court is the object of a personal attack which in itself is of such a nature as to carry a potential for bias and thereby disqualify the judge from acting upon the contempt proceeding.

In Mayberry v. Pennsylvania, 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971), the Supreme Court reversed a state criminal contempt sentence of eleven to twenty-two years on the ground that the due process clause of the 14th Amendment required a public trial before another judge, viz.— that the trial judge was disqualified because of personal attacks upon him. We do not feel that this case has any application here for upon that trial the trial court was characterized as a "dirty sonofabitch," a "dirty, tyrannical old dog," a "stumbling dog," and told to "shut up" and "go to hell." The rule of Mayberry has been followed consistently, and probably its two most recent and famous proponents are the opinions in United States v. Seale, U.S. Court of Appeals, 7th District, 461 F.2d 345 (1972), and In re Dellinger, U.S. Court of Appeals, 7th Circuit, 461 F.2d 389 (1972). Of course, none of these latter cases has any application to the situation presently before this court, as it is crystal clear from the record that at no time did Daniel Taylor ever indulge in any personal attack of any kind upon the judge.

We might add one other distinguishing feature which we have noted in all of the cases cited above, and that is the fact that in none of them was the contemnor at any time during the trial notified that he was in contempt of court but rather the court waited until the conclusion of the trial and then, "out of the clear blue," cited the contemnor on numerous counts of contempt and forthwith passed sentence.

Taylor was warned upon each occasion of his contemptuous action and of the court's holding that he was in contempt. Therefore, the action of the court was not an unexpected event.

Although we have discussed the disqualification of the trial judge and the circum-

stances of disqualification, we feel that a great deal of consideration should be given to the holdings of the Supreme Court in Ungar v. Sarafite, 376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964). Ungar, an attorney, was a prosecuting witness in a state criminal trial. However, he sought to exercise rights which he claimed to have as an attorney to dictate to the court the types of questions that he would answer, questions he would not answer, and to require rephrasing of questions if he did not like them. He constantly refused to heed the court's instructions to answer questions and was argumentative and critical of the court's rulings. Ungar was cited for contempt and the court, without the intervention of a jury, sentenced him to ten days' imprisonment and imposed a fine. Ungar claimed his constitutional rights to a fair hearing were violated because the contemptuous remarks made by him were a personal attack upon the judge which necessarily biased and disqualified him. However, the Supreme Court held that Ungar's strong objections to the orders of the court and his conduct during the examination and a flat refusal to answer questions when directed by the court, together with his intemperate and strongly worded comments on the propriety of the court's ruling, were not sufficient grounds upon which to bottom the constitutional rule of disqualification. The court further held that the characterization of Ungar's conduct as contemptuous, disorderly, and malingering was at most a declaration of a charge against him and was not a constitutionally disqualifying prejudgment of guilt.

We are of the opinion in this case that although the remarks of Judge Hayes were inappropriate, in the light of the obvious guilt of Taylor these remarks were not such a showing of bias as to require the disqualification of the judge.

Taylor claims that under KRS 432.260 the court could not imprison him for more than thirty hours without the intervention of a jury.

This section limits contempt punishment to a maximum fine of $30 or imprisonment for not more than thirty hours without the intervention of a jury. The constitutionality of this section has been seriously questioned upon a number of occasions. A similar section, KRS 421.140, fixes the maximum punishment of a witness charged with contempt at a fine not exceeding $30 and imprisonment not exceeding 24 hours.

In Arnett v. Meade, Ky., 462 S.W. 2d 940 (1971), we held that the limits prescribed by KRS 421.140 materially interfered with the administration of justice and were, therefore, unconstitutional. Although efforts have been made to distinguish KRS 421.140 and KRS 432.260, we believe that such is a distinction without a difference. We have now concluded that for the same reasons as set out in Arnett v. Meade, supra, the limitations imposed by KRS 432.260 likewise constitute material interference with the administration of justice and, therefore, we hold such limitation to be unconstitutional.

Taylor next claims that even if the court had the authority to summarily sentence him for contempt, a sentence of three and one-half years without the intervention of a jury violates the 6th and 14th Amendments of the Constitution of the United States. Taylor is rather loose in his designation of the sentence imposed which he has tended all through this appeal to designate as three and one-half years. The truth of the matter is, as shown by the record, that Taylor was sentenced on eight separate charges of contempt, six of said sentences being for six months, one for ninety days, and another for sixty days. As we total all of them we, of course, come up with three years and five months. However, as far as this court is concerned we treat them as separate sentences and not as a totality and shall so discuss them.

The Supreme Court has held upon a number of occasions that criminal contempt occupies the same position as any other criminal offense on the question of whether or not the contemnor is constitutionally entitled to a jury trial. If the offense was "petty," with the sentence being not more than six months, a jury trial was not required while if the offense was "serious," with the sentence being in excess of six months, the contemnor was entitled to a jury trial.

In Bloom v. Illinois, 391 U.S. 194, 88 S. Ct. 1477, 20 L.Ed.2d 522 (1968), the court held that in contempt proceedings where there was no maximum penalty, as we now have held, the seriousness of the offense for the purpose of determining whether or not a jury trial was constitutionally required is determined by the penalty actually imposed.

In Frank v. United States, 395 U.S. 147, 89 S.Ct. 1503, 23 L.Ed.2d 162 (1969), the court held that sentences for criminal contempt up to six months may be constitutionally imposed without a jury trial, while in Cheff v. Schnackenberg, 384 U.S. 373, 86 S.Ct. 1523, 16 L.Ed.2d 629 (1966), the court ruled that sentences for criminal contempt exceeding six months may not be imposed by federal courts absent a jury trial or a waiver thereof.

As these rules are based upon the constitutional right of a party to a trial by jury, they would apply equally to proceedings in a state court. It might be well to add at this point that there was not before the court in any of the cases cited the question of what is termed "aggregate sentences" for the purpose of determining the constitutional right to a trial by jury. No sentence meted out upon the charges against Taylor exceeded six months. Therefore, in the light of the cases above cited, Taylor was not constitutionally entitled to a trial by jury, and the sentences were not violative of any of his constitutional rights.

In United States v. Seale, U.S. Court of Appeals, 7th Circuit, 461 F.2d 345 (1972), the court reaffirmed the rule that the 6th Amendment right to trial by jury applied to serious criminal contempts and that in determining whether or not such contempt was "serious" the courts were required to look at the penalty actually imposed. The court then held that for the purpose of determining whether or not a contemnor was entitled to a trial by jury it would be necessary to look to the aggregate of the sentences and not to the sentences separately. In other words, the rule in Seale is such that we must total the penalty imposed by each sentence for the purpose of determining whether or not a contemnor is constitutionally entitled to a trial by jury.

Taylor claims that the rule in Seale is controlling in determining whether or not his criminal contempt was serious and the sentence thus invalid because he was not granted a jury trial. The trial court on its original charges of criminal contempt ordered that the sentences be served consecutively. This court permitted the trial court to later file a corrected judgment reducing the number of acts of criminal contempt charges and amending the sentences imposed.

The corrected judgment does not direct that the sentences, as amended, be served consecutively; therefore, they must be served concurrently. Thus, the totality of the sentence actually imposed is a jail sentence of six months.

Seale does not apply here, for no matter how we aggregate the sentences we always come up with a total penalty of six months in jail. In Bloom v. Illinois, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968), the guidelines established by the Supreme Court predicate the constitutional right to a jury trial upon a determination of the penalty actually imposed.

The penalty actually imposed on Daniel Taylor is six months in jail. He was not entitled to a jury trial. Frank v. United States, 395 U.S. 147, 89 S.Ct. 1503, 23 L. Ed.2d 162 (1969).

We hold that the sentences imposed on Daniel T. Taylor, III, must be served concurrently; viz.—one six-month jail sentence, and except for this holding the judgment of the lower court adjudging him in contempt of court and fixing the penalty for each act of contempt is hereby affirmed.

Finally, Taylor appeals from an order which provided that as he had been found in contempt of court he was henceforth prohibited from the further practice of law in Jefferson Circuit Court, Criminal Branch, Second Division.

■ This court has for a number of years exercised the sole right to fix requirements for admission to the Bar and has likewise had the exclusive authority to discipline or disbar attorneys. Cf. Ratterman v. Stapleton, Ky., 371 S.W.2d 939 (1963).

■ However, long before this court assumed jurisdiction of disciplinary actions, suspension was not a permissible punishment for criminal contempt and this has been the rule in this Commonwealth since Adams v. Gardner, 176 Ky. 252, 195 S.W. 412 (1917).

The order and judgment prohibiting Taylor from the practice of law in the Jefferson Circuit Court, Criminal Branch, Second Division, is hereby reversed.

PALMORE, C. J., and MILLIKEN, OSBORNE, REED, STEINFELD, and STEPHENSON, JJ., sitting.

All concur.