Narvel **TINSLEY**, Jr., Appellant,

v.

**COMMONWEALTH** of Kentucky, Appellee.

William Michael **TINSLEY**, Appellant,

v.

**COMMONWEALTH** of Kentucky, Appellee.

Court of Appeals of Kentucky.

April 20, 1973.

Rehearing Denied June 29, 1973.

Daniel T. Taylor III, M. V. Volpone, Louisville, Robert Allan Sedler, College of Law, University of Ky., Lexington, for appellant, Narvel Tinsley, Jr.

Robert Fleming, Charles Scott, J. T. McCall, Louisville, for appellant, Michael Tinsley.

Ed W. Hancock, Atty. Gen., Douglass Johnson, Sp. Asst. Atty. Gen., Frankfort, for appellee.

STEPHENSON, Justice.

Narvel Tinsley and William Michael Tinsley were charged in Jefferson Circuit Court with the crime of wilful murder. A jury found both Narvel and Michael guilty of wilful murder, and they were each sentenced to death by electrocution. Both appeal.

On the night of May 2, 1971, Officers Wilbur Hayes and John W. Schaefer, Jr., members of the Louisville Police Department, were on duty in civilian clothes and driving an unmarked police car. About 10:30 p. m., they turned into what is known as Waterbury Alley and observed three young men standing there. Officer Hayes made inquiry as to their purpose for being there; and after a remark by Narvel Tinsley, the officers got out of the car and asked for identification. The three were Narvel Tinsley, Michael Tinsley, and David Keith White. David White had no identification. Michael Tinsley offered his ID card to the officers. Narvel, as White later testified, "smarted off," and as Narvel later testified he told Officer Hayes it was "none of his business." Both Narvel and Michael Tinsley had pistols, which they had dropped or concealed at the approach of the police cruiser. White testified that Michael dropped his pistol to the ground, and Narvel concealed his behind an old car. Officer Hayes, after a verbal exchange, seized Narvel Tinsley and pushed him against the police cruiser holding Narvel's arm up behind his back. Then Michael backed up, reached down and picked up his pistol, walked up behind Officer Hayes and said, "What are you doing?" and as Officer Hayes started to turn, fired one shot into the back of Officer Hayes' head and two other shots into his back; then, according to David White, the eyewitness who testified for the Commonwealth, Narvel, with a gun in his hand, ran around the

other side of the car after Officer Schaefer and four or five shots were heard. Officer Schaefer was found to have sustained three shots in the back according to a Commonwealth's expert witness, fired less than six inches from his back, and two shots in the back of his head. Both officers died as a result of their wounds.

After Narvel and Michael had fled the scene, a man who lived nearby put Officer Hayes' body into the back of the police cruiser and drove some blocks away, then moved Officer Schaefer's body so as to conceal it. Around 6:30 a. m., Officer Hayes' body was discovered. A police investigation was commenced which resulted in the discovery of Officer Schaefer's body. A search of the area led to the discovery of a pistol, which was identified as belonging to Officer Schaefer. This gun was discovered behind a loose board in a house adjoining the alley together with Officer Schaefer's badge case and badge and Michael's ID.

Four days later a police investigation led officers to a railroad inspectional tunnel where Narvel and Michael were discovered hiding. The officer who discovered them testified that a voice identified the Tinsley brothers and that the one talking identified himself as Narvel. He threw out the two pistols which were in their possession. They were placed under arrest and each indicted and charged with the murder of Officer Hayes and Officer Schaefer.

On the trial of the case, David White, the 16-year-old youth who was the only eyewitness, testified first as stated above in regard to Narvel's running around the back of the car with the gun in his hand. He had prior thereto made a statement that Narvel ran around the back of the car and he had heard the shots, although he did not witness the slaying nor see a gun in Narvel's hand. He testified that Narvel told him that if he told anyone, he would be killed. He further testified that they ran to a nearby house and that Narvel stated: "We knocked the two cops off." He testi-

fied he later saw Narvel in front of White's house, and Narvel said he didn't really want to shoot that other cop because he was the nice one. He further testified that Narvel told him he got Hayes' gun from his body. Then he testified that they went to the home of Narvel's sister. Narvel related what had happened and stated that they had killed two officers, and Narvel showed the gun he took from the body. Michael still had his gun. White's statement and testimony are somewhat contradictory as to Narvel's actions at the scene of the crime. However, his testimony in regard to Michael is consistent, he stated that Michael did not move from his position after shooting Officer Hayes and while Officer Schaefer was being shot on the other side of the police cruiser. One of the pistols recovered at the railroad inspectional tunnel belonged to Officer Hayes, the other belonged to Michael. An FBI agent, an expert in ballistics, testified for the Commonwealth that the bullets recovered from the body of Officer Hayes after a ballistics test were found to be not inconsistent with and had the same characteristics as the bullets fired from Michael's gun, although they could not be identified positively as being fired from the gun. He excluded the possibility that the bullets could have been fired by any of the other weapons recovered at the scene. He further testified that the bullets recovered from the body of Officer Schaefer were positively fired from the pistol belonging to Officer Hayes.

Michael did not take the stand in his defense. Narvel testified in his own behalf, denied shooting Officer Schaefer, and testified that after Officer Hayes was shot and killed, he immediately fled the scene and later was joined by Michael, who at that time had both the pistols, his own and the one later identified as belonging to Officer Hayes.

The jury found Michael guilty of the wilful murder of Officer Hayes and Narvel guilty of the wilful murder of Officer Schaefer.

Both Michael and Narvel were charged in the indictment with the wilful murder of both Officer Hayes and Officer Schaefer. The trial court in effect directed a verdict for Michael on the charge of the wilful murder of Officer Schaefer, and likewise in effect directed a verdict for Narvel on the charge of the wilful murder of Officer Hayes as the jury was not instructed on these charges in the indictment.

Prior to the trial, both Narvel and Michael moved for a severance. The trial court overruled each motion and this ruling is asserted by both Narvel and Michael as error. They maintain that their defenses were antagonistic and being tried together was prejudicial.

Michael did not testify, nor did he offer any witnesses to testify in his behalf. Narvel's defense was that he did not shoot Officer Schaefer; that he fled the scene after Officer Hayes was shot and killed. Criminal Rule 9.16 provides that separate trials shall be granted if it appears that a defendant or defendants will be prejudiced by a joint trial.

In order to justify the granting of a severance, it must appear that the defendants have antagonistic defenses, or that the evidence as to one defendant tends directly to incriminate the other. Underwood v. Commonwealth, Ky., 390 S.W.2d 635.

The only evidence which conceivably could be argued as showing antagonistic defense is Narvel's testimony that after he had fled the scene of the crime he met Michael and at that time Michael had his own gun and Officer Hayes' gun. Narvel argues that his theory of defense was that Michael "possibly" shot and killed Officer Schaefer.

The testimony of David White and the FBI ballistics expert foreclose this "possibility". White's testimony that Michael was not on the side of the police cruiser where Officer Schaefer was shot and the testimony that the gun that shot Officer Schaefer was fired at a distance of less than six inches from his back constitute direct testimony to refute this arguable "possibility" not supported by any evidence.

We conclude that the trial judge did not abuse his discretion in denying a severance. The defenses were not antagonistic or hostile within the purview of RCr 9.16, there being no attempt on Narvel's part to directly incriminate Michael in the shooting of Officer Schaefer. In short, the defenses were not antagonistic at all, and the record does not disclose any prejudice resulting from a joint trial.

Narvel asserts that he was not afforded a public trial as guaranteed to him by the Sixth Amendment to the Constitution of the United States. We determine from the record that the courtroom in which the trial was held was relatively small. Security measures were in effect—spectators were searched before being admitted. Adopting these procedures was in the sound discretion of the trial court and no abuse is shown. Representatives of the news media were present, and it is apparent that the courtroom was substantially filled to capacity. A brief discussion of the right to "public trial" is contained in Johnson v. Simpson, Ky., 433 S.W.2d 644, cited by Narvel, which refutes his contention. There is nothing in our case law which stands for the proposition that the constitutional guarantee demands that all the public who desire to attend be admitted. This was a public trial within the meaning of the constitutional guarantee.

Narvel next asserts that the trial court erred in declining to permit the testimony of certain witnesses called for the defense. Narvel also asserts as error the trial court's declining to permit him to introduce evidence as to the reputation or proclivity for violence of Officer Hayes. These two assignments of error are treated together since they involve substantially the same assertion. Narvel's lawyer stated to the trial court in chambers that his theory of defense was that the news media and

public agencies in Louisville were framing his client; he further stated a theory of defense that this was a political trial. After Narvel testified and one other witness for Narvel testified, the trial court required Narvel's lawyer to submit a list of witnesses, several of whom were briefly examined in chambers and excused by the trial court. Two of the witnesses proposed to testify as to whether or not Narvel was being denied a public trial; one witness proposed to testify as to "unusual force" complaints in Officer Hayes' file; one witness proposed to testify as to Officer Hayes' reputation for violence, although he testified in chambers that he was not familiar with such reputation; the chief of police was proposed as a witness for Narvel for the reason he was in general charge of the investigation, although he had no personal knowledge of the facts; and the county judge who had briefly visited the autopsy room and knew no facts relative to the investigation was called as a defense witness and excused by the trial judge after being examined in chambers. Narvel argues that it is his prerogative to decide what witnesses shall be called to testify for his defense, and that the trial court has no authority to deny him the testimony of his witness unless there is a studied design to flaunt the court with the frivolous or inappropriate. We agree that ordinarily the competence and relevance of a witness' proposed testimony are to be determined after he takes the stand, not before. However, where the circumstances are such as to indicate that a proposed witness probably will have no relevant and competent testimony to give, and that he is being called as a witness for frivolous or otherwise improper purposes, the trial court may by appropriate inquiry determine whether there is any probability that the witness will have any relevant and competent testimony to give, and if not may refuse to allow the witness to take the stand. Narvel's defense was that he did not shoot anybody; that he fled the scene after Officer Hayes was shot. He testified that he did not know Officer Hayes. The proposed testimony regarding Officer Hayes'

reputation for violence was not relevant. Evidence of individual acts of violence is not admissable. A decedent's reputation for violence is not admissable in a situation where the defendant did not know the decedent. And if all legal requirements are met, testimony of this nature is permissible only to support a theory of self-defense or defense of another. The Commonwealth's evidence excluded any theory that Narvel shot Officer Hayes, and this is reflected in the trial court's instructions to the jury. How exclusion of this proposed testimony could have been prejudicial to Narvel is not revealed in the record. Although Narvel argues that the other witnesses excluded were vital to his defense, he does not say in what respect. A number of witnesses who were permitted to testify knew nothing of the facts surrounding the case. The theory advanced by Narvel that he was being framed by the news media and public agencies addresses itself to a motion for change of venue, which is not before us. This is not a defense to a charge of wilful murder, nor can we comprehend a theory of defense that the trial was political. We conclude that there was a studied design to flaunt the trial court with the frivolous or inappropriate; that the denial of the trial court of the excluded testimony was not in any degree prejudicial to Narvel. The proposed testimony was irrelevant and incompetent, and was properly excluded by a refusal to permit the witnesses to take the stand.

■■■■ Narvel asserts that he was denied a jury of his peers. He argues that each juror on the panel was a property taxpayer in violation of the Sixth Amendment of the United States Constitution. Narvel asserts discrimination. However, purposeful discrimination may not be assumed or asserted, it must be proved. Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759. Swain and Alexander v. Louisiana, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536, specify in detail the procedure to be followed by defendants asserting systematic exclusion of a group or race from jury

panels or invidious discrimination in the selection of citizens to serve as jurors. We cannot presume non-permissible methods of jury selection in this case absent a showing by Narvel in conformity with Swain and Alexander. Such a showing entails a taking of proof from the jury commissioners or a showing of the makeup of jury panels for a period of time so as to make a prima facie case of invidious discrimination. Insofar as this record is concerned, Narvel was tried by a jury of his peers.

The trial court instructed the jury that Officer Hayes and Officer Schaefer had the right at the time and place referred to in evidence to briefly stop and restrain the defendants. Narvel argues that this instruction was prejudicial. We regard it as superfluous. The officers had a right to ask for identification and to inquire as to the business of three young men in an alley at night. Narvel argues the law of arrest. The record shows that Officer Hayes was placing Narvel under arrest. Whether the arrest was legal or illegal is not relevant to this case. Nor is Narvel's argument relevant to any theory of his defense. The giving of the instruction is not shown to be prejudicial.

Narvel further argues that it was prejudicial to give an aiding and abetting instruction as to the death of Officer Hayes. The jury did not convict pursuant to the aiding and abetting instruction, and it is certainly arguable that a jury drawing inferences from the testimony introduced by the Commonwealth could have done so. Narvel does not cite authority for his contention and we conclude Narvel was not prejudiced by the trial court's instructions.

Michael asserts that both the Commonwealth's attorney and Narvel's lawyer commented upon his failure to testify, which was prejudicial to him. Narvel asserts prejudicial argument by the Commonwealth in closing argument.

In his closing argument, the Commonwealth's attorney recited to the jury the various steps that take place on a criminal case from arrest through grand jury action, the trial and then appeal. Narvel objected, and the trial court admonished the jury. We conclude that the trial court's admonishment to the jury removed any prejudice, particularly in view of the fact that during the voir dire Narvel's lawyer asked if the fact that there could be an appeal of a conviction would dispose the jury to more readily convict.

The comments complained of by Michael were at most inferences; "if the brother cares to offer a defense"; "Michael shot him and we have not heard one single bit of evidence to the contrary"; "Michael charged his field and got him. Has anyone said he didn't? No."

The test as concerns indirect comments is whether the comment is reasonably certain to direct the jury's attention to the defendant's failure to testify. Neal v. Commonwealth, Ky., 302 S.W.2d 573. These inferences did not direct the jury's attention to Michael's failure to testify so as to violate the constitutional and statutory prohibition. We believe in view of the entire record, these inferential comments constituted harmless error beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705.

Michael asserts misconduct of Narvel's lawyer as prejudicial error, while Narvel asserts misconduct of Michael's lawyers as prejudicial error and further, prejudicial conduct on the part of the trial judge.

Early in the trial Michael's lawyers complained in chambers concerning the conduct of Narvel's lawyer; they informed the judge that in order not to bring to the attention of the jury the basis for their objection they would use the phrase Objection No. 1. Thereafter during the entire course of the trial this objection appears in the record frequently, usually in conjunction with an objection on the part of the Commonwealth. The reason for the

style of the objection was never asserted in the hearing of the jury and we cannot assume any prejudice against Narvel on this account.

 Throughout the trial from the voir dire of the jury to cross-examination and direct examination of witnesses the record is liberally sprinkled with objections to questions by Narvel's lawyer. He persisted throughout in attempting to introduce before the jury irrelevant and incompetent factors. On eight occasions the trial court found Narvel's lawyer to be in contempt of court for so persisting.[1] On each occasion these citations for contempt were ordered in chambers and not before the jury. Michael asserts that the conduct of Narvel's lawyer denied him a fair trial. There are references in the record of proceeding in chambers wherein "antics", "arm waving" and "sarcastic tone of voice" on the part of Narvel's lawyer are complained of. Without going into tedious detail, we conclude from the entire record that in view of the overwhelming evidence of guilt we could not infer any substantial possibility of resulting prejudice in the minds of the jury against Michael as a consequence of the conduct of Narvel's lawyer. In the absence of inflammatory remarks and contemptuous language, we would not like to be put in the position of counting objections to irrelevant and incompetent questions in order to determine their effect on the jury.

 Narvel argues that the conduct of the trial judge denied him a fair trial; that the numerous contempt citations even out of the presence of the jury inhibited his lawyer in the conduct of his defense. This assertion is not borne out by the record. The trial court has the responsibility for proper decorum during the trial, and for insuring that only relevant and competent testimony is presented to the jury. Preston v. Commonwealth, Ky., 406 S.W.2d 398.

 Many of Narvel's objections to questions for the Commonwealth were sustained as were Commonwealth objections to Narvel's questions. Again we do not feel that we should count the objections to incompetent testimony as a determining factor on whether or not the jury was influenced. If more Commonwealth objections were sustained by the trial court it is because Narvel's lawyer persisted in his attempts to inject irrelevant and incompetent testimony into the trial, and this continued throughout the trial despite the citations for contempt, which did not appear to deter Narvel's lawyer in the least. The trial court did not at any time during the course of the trial use degrading or offensive language to Narvel's lawyer. Peckham v. United States, 93 U.S.App.D.C. 136, 210 F.2d 693, is illustrative of the type of conduct and language employed on the part of the trial court toward a defense counsel which would justify a reversal because of obvious prejudicial effect on a jury. We do not have this quality of conduct here. From a review of the entire record, there is no discernible bias against Narvel's lawyer on the part of the trial court from which we could infer any substantial possibility of resulting prejudice in the minds of the jury against Narvel so as to deny him a fair trial. It cannot be discerned from this record that the trial court expressly or impliedly demonstrated in any degree feelings towards the merits of the case or Narvel individually.

 Both Narvel and Michael assert error in that the death penalty is unconstitutional. Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, has resolved this contention. This decision leaves us no alternative save to reduce the punishment to the only lower penalty authorized by KRS 435.010, which is life imprisonment.

Upon the entire record we do not find any prejudicial error. The record portrays a case of vicious, wanton taking of human life and we do not find a single redeeming feature in the record on behalf of either Narvel or Michael.

---

1. Taylor v. Hayes, Ky., 494 S.W.2d 737, decided March 23, 1973.

The judgments are directed to be amended to reduce the sentence from death to life imprisonment. So amended they are affirmed.

PALMORE, C. J., and MILLIKEN, OSBORNE, REED, STEINFELD and STEPHENSON, JJ., sitting.

All concur.