Bradford UNDERWOOD et al., Appellants,

v.

COMMONWEALTH of Kentucky, Appellee.

Court of Appeals of Kentucky.

Feb. 12, 1965.

As Modified on Denial of Rehearing
June 4, 1965.

John Swinford, Wayne W. Fitzgerald, Cynthiana, for appellants.

Robert Matthews, Atty. Gen., Frank D. Berry, Asst. Atty. Gen., Frankfort, for appellee.

DAVIS, Commissioner.

The appellants, Bradford and Emma Underwood, are husband and wife. They were jointly indicted, tried and convicted of violation of KRS 434.010. Bradford Underwood received sentence of imprisonment for seven years; Emma's sentence was fixed at imprisonment for five years.

In their joint appeal appellants assign the following claimed errors: (1) A separate trial should have been granted for. Emma pursuant to RCr 9.16; (2) the court failed to properly instruct the jury as to the limited purpose of the proof of other crimes; (3) the court erroneously instructed the jury; and (4) the evidence was insufficient to support the verdict, and directed verdict of acquittal should have been given.

Bradford Underwood was employed as a milk truck driver by Kentucky Cardinal Dairies, Inc. from 1955 until April, 1963. In the course of his work Bradford collected milk from various farmers along the milk route. The milk was hauled in conventional milk cans; the average weight of a full can of milk is approximately 85–87 pounds. Bradford delivered the milk so collected to the dairy plant in Cynthiana, where the milk was weighed and tested by other employees of the dairy. If such tests reflected that the milk was sour, dirty or otherwise unsatisfactory, the dairy refused to accept the milk. In such cases of rejection, Bradford would rehaul the milk to the producer from whom it had been obtained.

Bradford's compensation, paid entirely by the dairy, was $7.00 per day plus 40¢ per thousand pounds of milk hauled. Neither he nor the shipper of rejected milk received compensation for such milk.

In April, 1963, a change was made in the relationship between Bradford Underwood and the dairy. From and after that date he furnished his own truck chassis, equipped with a body furnished by the dairy. Underwood no longer drew any salary, but his compensation was fixed at 40¢ per hundred pounds of milk delivered; the money for the payment was deducted from the gross proceeds due the shippers, so ultimately the shippers were paying Underwood for the hauling after April, 1963.

In February, 1960, Bradford Underwood began to deliver shipments of milk to the dairy in the name of producer J. C. Wise. The prosecution showed that Kentucky Cardinal Dairy, Inc. had issued many checks payable to J. C. Wise for milk. In round figures, the aggregate of the checks so issued to J. C. Wise was $2,487 for 1960, $2,442 for 1961, and $2,729 for 1962. There was no shipment to Kentucky Cardinal from J. C. Wise after December 31, 1962.

However, it was shown that J. C. Wise's name began to appear as a milk shipper to the Kraft Foods Company cheese plant in nearby Owenton on February 2, 1963. Eleven checks from Kraft to J. C. Wise

were introduced in evidence; they bear dates beginning February 28, 1963, and ending August 15, 1963, and cover amounts aggregating $1,139.45. The final check was for shipments of milk in the name of J. C. Wise on July 16th and 17th, 1963. No shipment from J. C. Wise was received by Kraft after July 17, 1963.

The specific charge contained in the indictment is that "On and between the 1st day of July, 1963, and the 15th day of July, 1963 * * * the * * * defendants committed the crime of unlawfully and fraudulently converting to their own use a quantity of raw milk of the value of $183.84 which was the property of the Kentucky Cardinal Dairies, Inc. * * *." The item of $183.84 was related to a check payable to J. C. Wise, issued by Kraft Foods, dated July 30, 1963; the check covered payment for milk received by Kraft from the shipper known to it as J. C. Wise during the period July 1st through July 15th, 1963.

The prosecution's theory of the case is that J. C. Wise is nonexistent, and that in truth the name is simply an alias for appellant Bradford Underwood. The inference drawn by the prosecution from the circumstances is that Underwood systematically poured off a portion of milk from the milk cans of various shippers; that he consolidated such poured off milk into cans he then delivered, first to Kentucky Cardinal—then to Kraft—all in the fictitious name of J. C. Wise.

In support of this theory the commonwealth showed the checks heretofore mentioned. A bank teller testified that he had cashed twelve checks, dated July 15, 1962; through December 31, 1962, all payable to J. C. Wise and all drawn by Kentucky Cardinal Dairies. The teller said that the man whom he knew as J. C. Wise, and for whom he cashed the checks was, in fact, Bradford Underwood. The banker said that he recalled that Bradford Underwood (known to him only as J. C. Wise) had

endorsed at least one of the checks in the banker's presence.

Additionally, there was documentary evidence reflecting that checks emanating from the Kraft Company, payable to J. C. Wise (including the check of $183.84 dated July 30, 1963) were credited into the bank account of Bradford Underwood at Harrison Deposit Bank—not the bank where he had *cashed* the checks from Kentucky Cardinal.

It was shown that the butterfat content of the "Wise" milk ranged well above the average butterfat content of other milk produced in the same area. The commonwealth draws the inference from this that Underwood was drawing the cream off the top of the various cans in "producing" the "Wise" shipments.

Another significant circumstance was the absence of "Wise" milk shipments during periods when Underwood was on vacation —coupled with the complete "drying up" of the "Wise" herd after July 17, 1963, the last day Underwood "made his haul."

The Kraft milk route driver testified that he had first learned of the desire of J. C. Wise to become a shipper to Kraft when he had a telephone call from a man who identified himself as "J. C. Wise." The Kraft man never did see J. C. Wise, nor was he able to find out anything about him in the neighborhood where the milk was picked up. In fact, nobody could identify this "Wise" man.

However, appellant Emma Underwood (who worked in the laboratory at Kentucky Cardinal) did see the Kraft driver on two occasions. These were the occasions when the final two Kraft checks payable to J. C. Wise were delivered to her. When she obtained the last check, posing as the daughter of Wise, as the witness tells it: "I asked her how come they quit milking, and she said her dad was getting too old and couldn't get anybody to help him, so he was going to quit and sell out and move to town and I asked her how far did they

live up that road and she said Bridge Street in Cynthiana, that's all."

There were certain other incriminating circumstances, including evidence relating to Bradford Underwood's stopping the milk truck with marked regularity at a spot somewhat distant from any house or barn— with each stopping being accompanied by noises suggesting that milk cans were being moved about within the truck.

Bradford Underwood took the stand and categorically denied everything. Mrs. Underwood did not testify.

■ Emma Underwood made timely motion that she be granted a trial separate from the trial of her husband. The motion was overruled, and Emma assigns this ruling as reversible error. RCr 9.16 has changed Kentucky's former rule of separate trial as a matter of right, which was extended under former Criminal Code of Practice, § 237. In Hoskins v. Commonwealth, Ky., 374 S.W.2d 839, the rule was adopted that "the mere fact that evidence competent as to one defendant but incompetent as to the other may be introduced is not alone sufficient to establish such prejudice as to require the granting of separate trials. Ordinarily there must be some additional factor, such as that the defendants have antagonistic defenses, or that the evidence as to one defendant tends directly to incriminate the other, e. g., one defendant's admissions directly implicate the other." In Hoskins we held that there was no showing of such prejudice as to require separate trials. We think the same situation prevails in the present case. For Emma Underwood it is argued that her "defense" was "antagonistic" to Bradford's, since he took the stand and she did not. It is our view that this is not the quality of antagonistic interest as would require separate trials, even it if could be said to be antagonistic at all. We hold that the lower court correctly denied the motion for separate trials.

■ Appellants next challenge the convictions on their assertion that the trial

court did not instruct the jury as to the limited purpose of the proof of other crimes. Throughout the trial appellants did object to every reference to "Wise" checks and other actions related to the "Wise" transactions that related to any date not between July 1 and July 15, 1963. The trial court consistently overruled these objections. However, there was one occasion—and only one—upon which counsel for appellants asked the trial court to admonish the jury as to the limited effect of the evidence of prior transactions. As soon as that request for admonition was made, the court gave an appropriate admonition. We find the admonition to be sufficient, since it clearly apprised the jury that it could consider such evidence as it might go to show a common plan or scheme of operation "if you believe it does so show, and for no other purpose." As a matter of fact, the exception to the general rule against receiving evidence of other offenses also relates to *identity*; in this case there was a sharp issue as to the identity of J. C. Wise—and his "daughter." The evidence of other activities in the general plan did touch directly on the identity as to each of the defendants. Moreover, the novel means of the commission of the crime, according to the prosecution's theory—is another basis for the admission of the evidence. See Wharton's Criminal Evidence, 12th Ed., Vol. 1, § 235, wherein it is said:

> "Evidence of an independent and separate crime is admissible when such evidence tends to aid in identifying the accused as the person who committed the particular crime under investigation. Evidence of other crimes is thus admissible to establish the identity of the defendant in prosecutions for arson, burglary, robbery, bribery, crimes involving fraud, forgery, violation of liquor laws, and sex crimes.

> "When a crime is committed by novel means or in a particular manner, the proof of other distinct crimes may be admitted for the purpose of identifying the accused as the perpetrator

thereof. In order, however, for evidence of another crime to be admissible to prove the identity of the accused, there must be such a logical connection between the crimes that the proof of one will naturally tend to show that the accused is the person who committed the other."

Therefore, the admonition given by the trial court could have pointed out the additional considerations of identity and novelty that could have been given to the evidence. Failure to include these elements did not prejudice the appellants, but was more favorable to them than a complete admonition would have been. It should be recalled that these appellants are not asserting that it was erroneous to admit the evidence of other crimes, but that the trial court failed to give a proper admonition. We hold that in light of the admonition given there is no merit in the contention. See Rogers v. Commonwealth, 264 Ky. 187, 94 S.W.2d 345, and cases compiled in 6 Ky. Digest 2, Criminal Law, ⊜824(8).

We are unable to accept the arguments advanced for appellants respecting their attack upon the instructions given. Although we have catalogued appellants' challenge of the instructions as one, they have advanced three assaults upon the instructions, which we condense to two, as follows:

First, it is insisted that there was a fatal variance between the indictment and proof, so that the proof warranted an instruction for the offense denounced by KRS 434.220, but not the offense condemned by KRS 434.010. It is recalled that the indictment charged the conversion of milk, of the value of $183.84, "which was the property of the Kentucky Cardinal Dairies, Inc." Since the milk was scheduled for delivery to Kentucky Cardinal, but was, according to the prosecution's theory, diverted to the Kraft company, it is reasoned that Kentucky Cardinal suffered nothing, particularly as it did not pay for any milk it did not receive.

KRS 355.2–401, a part of the Uniform Commercial Code, deals with the passage of title of personal property under conditions similar to those at bar.

■■ It is our view that, for the purposes of prosecution under KRS 434.010, when the shippers delivered their milk to Bradford Underwood for delivery to Kentucky Cardinal, it was equivalent to delivery to Kentucky Cardinal for purpose of passage of title under the UCC provision cited. The fact that a right of rejection remained in the dairy merely strengthens this conclusion, since the UCC provision recites that the rejection under such conditions "revests" title in the seller. KRS 355.2–401(4). Although it is true that Kentucky Dairies did not pay out money for the milk diverted to Kraft, yet the milk was already the property of Kentucky Dairies and Underwood had no authority to appropriate it to his own purposes.

■ The next complaint as to the instructions is addressed to the form of Instruction No. 1 and to its inapplicability to appellant Emma Underwood. The instruction is necessarily somewhat involved, but there is no difficulty in understanding it, and we cannot feel that the jury could have been misled by the instruction. The chief complaint against the instruction has to do with its repeated use of the phrase "that they, or either of them" in referring to the two appellants. It was proper to so instruct. Moreover, by Instruction No. 4 the trial court told the jury: "if upon the whole case you have a reasonable doubt of the defendant, or either of them, having been proved guilty, or of any fact necessary to establish their guilt or the guilt of either of them, then you shall find them, or him or her about which you have such reasonable doubt, not guilty." The instructions are to be read and considered in their entirety; we think it is plain that there was no basis for complaint as to the form and substance of the instructions. 1, Stanley's Instructions to Juries, § 40.

■ Although it is not proper to instruct that a mere aider and abetter may be convicted as a principal (cf. Broughton v. Commonwealth, 303 Ky. 18, 196 S.W.2d 890; Macom v. Commonwealth, 302 Ky. 136, 194 S.W.2d 169), in this case there was evidence, not required to be detailed here, tending to show that Emma did in fact sometimes accompany Bradford on his milk runs, and from which the jury reasonably could infer that she participated as a perpetrating principal vis-a-vis a mere aider and abetter. See Waggner v. Commonwealth, 298 Ky. 153, 182 S.W.2d 661.

The judgment is affirmed as to each appellant.