Danny Gale **RACHEL**, Appellant,

v.

**COMMONWEALTH** of Kentucky, Appellee.

Court of Appeals of Kentucky.

April 25, 1975.

Anthony M. Wilhoit, Public Defender, J. Vincent Aprile, Asst. Public Defenders, Frankfort, for appellant.

Ed W. Hancock, Atty. Gen., Patrick B. Kimberlin, III, Asst. Atty. Gen., Frankfort, for appellee.

VANCE, Commissioner.

The appellant, Danny Gale Rachel, was indicted jointly with George Bishop Boggs for the murder of Mack Trent, Jr. They were tried jointly. Rachel was convicted of voluntary manslaughter and sentenced to eighteen years' imprisonment. Boggs was convicted of murder and sentenced to life imprisonment. They have prosecuted separate appeals relying principally upon the same allegations of error.

Rachel and Boggs were arrested in Cumberland, Kentucky, when an automobile driven by Boggs ran into the side of a building. Boggs was drunk at the time.

Several hours after the arrest Rachel informed the jailer that he believed that he and Boggs killed a man the night before. The jailer informed the sheriff of this fact and the sheriff examined Rachel at the county jail. The sheriff gave the following testimony concerning Rachel's statement:

"A. Mr. Rachel, he started telling me that him and another boy from over in Perry County had went down to Lightning's place, a beer joint at Jeff, and this boy was with him. At that time he couldn't tell me his name. He couldn't remember his name, and I asked him his name, but he referred to him as this boy with him. Said he went in back of the dance hall of Lightning's place and bought some grass, which we refer to it maybe as marijuana or grass, and he re- ferred to it as grass, came back out into the car and they smoked a cigarette or two of this grass and they they left there and went down to Hazard and bought some gas and maybe some oil. I don't remember now where they said oil or not, but anyway, he did say some gas, and came back and above Lightning's place there at Jeff this fellow was hitchhiking. They stopped and picked him up and he asked them to take him to Cumberland, Kentucky and he said they told him they would if he would buy them some gas. And he said, 'I will,' he would buy them some gas. So he said they came down through . . . . Just one minute, now. Did he identify that hitchhiker that they picked up?

"A. No, he said he didn't know his name. I asked him did he know who he was. He said he didn't.

"24. All right, go ahead.

"A. He said they came on up through Whitesburg and along up the road some- where along the line, why, the fellow said he had a gun under his belt, and they came on to Whitesburg, up on the mountain. And I asked him, I said, 'Well, do you know where this Weber's Sausage place is?' And they said, 'No, we don't know, and we didn't recognize it or pay any attention to it as we came by, but we did come up a steep part of the mountain and it leveled off, and we came out a little ways and pulled off the right side of the road and me and this boy driver got out of the car, went around to the back,' and then the boy that was driving got back in the car be- fore he did. And when he came back to the car this fellow they had in the back, which later we learned his name was Boggs, had a rag or something around his neck choking him, and he asked him what he was doing and he said 'Shut up or I'll kill you, too.' Then he said Boggs took the Trent boy— which we later found his name—out of the car and rolled him over the bank, but

while he was rolling him over the bank he jumped in the car and started it and tried to put it in gear, just started it, and Boggs came back and got in the car with him and they came on towards Cumberland, or went on towards Cumberland. On the other side of the mountain the Boggs boy told him to stop and let him drive, and the Boggs boy, he started driving at that point and drove on into Cumberland, and there in Cumberland they run into a building or backed into a building and then was picked up by the city police, deposited there and lodged in jail in Cumberland.

"25. Now, did you have some further interrogation of the defendant Rachel?

"A. Well, I asked Rachel did he have any part in killing this boy, and he said, 'Yeah, I helped choked him.' And when Murrell Harrison . . . . Well, I knew it was a . . . since it started in Perry County and the man was throwed out on the Whitesburg Mountain in Letcher County, then I knew that I would have to have some help, because the jurisdiction line was in Harlan, so we had Vanover to call the State Police. So Detective Harrison and Trooper Jarvis came and we went back to the building and took the statement again of Rachel. And he told it just about everything he told me excepting about the choking, and I asked Detective Harrison to ask him didn't he tell me or did he tell me that he helped choke him and he did, he asked him that question, and Rachel said he did."

Rachel later was interrogated by a state detective and signed the following written statement:

"A. My name is Danny Gale Rachel. I'm 19 years old and attended school through the 8th grade. I give this statement to Detective M. J. Harrison and Trooper Ronnie Jarvis, known by me to be members of the Kentucky State Police, and present also is Harlan County Sheriff Walden Holbrook. I am giving this statement free and voluntarily, without any threats or promises having been made toward me. I have had a statement of my rights read to me and I understand these rights.

"Me and Mack Trent, Jr. were down at Lightning's at the beer joint. Mack went into the back of the place where they dance and bought some grass. We left and went riding around and smoked the grass. We went to Hazard and got some gas and two quarts of oil and came back above Lightning's and picked up this man who was hitchhiking. I didn't know him then but I now know his last name is Boggs. It was about 11 to 11:30 when we picked him up, and Boggs asked us to take him to Cumberland. We came through Whitesburg and across the mountain on U.S. 119. Boggs kept talking about having a gun in his belt, and Boggs told Trent to pull off at the next wide place. And he pulled off the road and I got out and Trent got out and got back in the car first. I walked around the car to the door and Boggs had a piece of cloth around Trent's neck choking him, and when Boggs turned him loose he went limp. I said, 'What are you doing?' and Boggs said, 'Shut up or I'll kill you.' Boggs then got Trent out of the car and rolled him over the hill. I jumped in the car and started the car up. I was trying to get the car in gear but before I could get started Boggs got back in the car. He told me to go to Cumberland and I started driving fast, and before we got off the mountain Boggs told me to pull over and let him drive. I was going to wreck the car and try to get away. Boggs drove on into Cumberland and ran the car into the back door of the hardware store. He backed out and the police stopped us in front of the police station. Before the choking took place Trent was driving, I was sitting in the right front and Boggs was sitting in the left rear. There had been no fuss or argument

prior to the choking. We were all drinking and me and Trent had smoked about five joints of pot.

"Q. Did you state previously to Sheriff Holbrook and Mr. Vanover, the turnkey, that you choked Trent also?

"A. Yes, I did.

"Q. Why did you make that statement?

"A. Because Boggs was present and I was afraid.

"Q. Why didn't you tell the Cumberland Police about the choking this morning when you were picked up?

"A. Because Boggs was present and I was afraid.

"I have read my statement consisting of two pages, and it is true to the best of my knowledge.

"/s/ Danny G. Rachel
"7/21/73"

Boggs was interrogated by the state detective and signed a written statement acknowledging that he choked the deceased and that "Rachel held his hands". The court directed that that portion of Boggs' statement referring to the fact that "Rachel held his hands" be deleted. When read to the jury, Boggs' statement was as follows:

"A. My name is George Bishop Boggs. I am 28 years old, completed the ninth grade in high school. I give the following statement to Detective M. J. Harrison and Trooper Ronnie Jarvis, known to me to be members of the Kentucky State Police, freely and voluntarily. No threats or promises have been made to me. I have had a statement of my rights read to me and understand these rights.

"I started drinking about 1 P.M. yesterday and went to Hazard with two girls. Polly is one of their names. I don't know the other one's name, but they work in Nancy's Bar in Cumberland, Kentucky. I remember riding around in a Chevrolet, a red one. It was the car the City Police now hold in Cumberland. Me and Danny and this other guy, we were drinking. Me and Danny and the other guy pulled off the road on the side of the mountain on U.S. 119 toward Whitesburg. I choked the other fellow. I choked him and he quit moving, and I rolled him over the hill. We didn't return. I was driving the car, and we drove to Cumberland. We started to turn around and hit a door and the police took us to jail. We had no intentions to break in the place. I can't think of any reason why I choked the man.

"I have read my statement, consisting of one page, and it is true to the best of my knowledge.

"/s/ George Boggs
"Date: July 21, 1973"

Both Rachel and Boggs moved for separate trials on the grounds that they would be prejudiced on a joint trial because their defenses were antagonistic. Neither Rachel nor Boggs testified. Boggs' counsel sought to exonerate him on the grounds that he was drunk and did not have a premeditated intent to kill. Rachel's counsel argued to the jury that the only evidence against Rachel was the testimony of the sheriff as to Rachel's admission but that this admission was made by Rachel only because he was afraid of Boggs as he later claimed in his statement to the state detective.

Prior to the adoption of the Criminal Rules, Section 237 of the old Criminal Code provided:

"If two or more defendants be jointly indicted for a felony any defendant is entitled to a separate trial."

This Rule was changed by the adoption of RCr 9.16 which now provides:

"If it appears that a defendant or the commonwealth is or will be prejudiced

by a joinder of offenses or of defendants in an indictment or information or by joinder for trial, the court shall order separate trials of counts, grant separate trials of defendants or provide whatever other relief justice requires. * * *."

 Whether a separate trial should be granted is a matter within the sound discretion of the trial judge. Before a jointly indicted defendant is entitled to a separate trial, he must timely demonstrate to the trial judge that he will be prejudiced by a joint trial. Bunton v. Commonwealth, Ky., 464 S.W.2d 810 (1971); Allee v. Commonwealth, Ky., 454 S.W.2d 336 (1970).

While there is some authority for the proposition that severance should be granted when the defenses of those jointly indicted are antagonistic, see 75 Am.Jur.2d, Trials, § 21, we have never held that severance is required, as a matter of law, in such cases.

The first reference to the subject of severance after the adoption of the Criminal Rules came in Hoskins v. Commonwealth, Ky., 374 S.W.2d 839 (1964). *Hoskins* presented a contention that a severance should have been granted because evidence was introduced which was competent as to one defendant but incompetent as to another. We held that fact alone did not require a severance and added "ordinarily there must be some additional factor, such as that the defendants have antagonistic defenses, or that the evidence as to one tends directly to incriminate the other, e. g., one defendant's admissions directly implicate the other."

This language in *Hoskins, supra,* was used only to suggest examples of the kinds of additional factors which when coupled with the introduction of evidence competent as to one defendant but not as to another might require a separation of trials. *Hoskins* did not hold, or even suggest, that antagonistic defenses of persons jointly indicted, standing alone, would necessarily result in prejudice in case of a joint trial.

We next decided Underwood v. Commonwealth, Ky., 390 S.W.2d 635 (1965), in which there was an allegation of error for failure to grant separate trials because the defenses were claimed to be antagonistic in that one defendant testified while the other did not take the stand.

In *Underwood* we cited *Hoskins* with approval and stated:

"* * * It is our view that this is not the quality of antagonistic interest as would require separate trials, even if it could be said to be antagonistic at all. * * *."

*Underwood* does not hold that separate trials must be granted when the defenses are antagonistic.

The next case involving separation of trials was Tinsley v. Commonwealth, Ky., 495 S.W.2d 776 (1973). In *Tinsley* we upheld the refusal of the trial judge to grant a separation of trials but we stated therein:

"In order to justify the granting of a severance, it must appear that the defendants have antagonistic defenses, or that the evidence of one defendant tends to incriminate the other. * * *."

*Underwood* was cited as authority for the statement.

 We have reviewed these cases to point out the fallacy in the appellant's argument that the trial court erred as a matter of law by refusing to grant separate trials because the defenses were antagonistic.

 There may be some inherent disadvantage to one defendant if he is required to be tried jointly with a codefendant. As pointed out, our previous Criminal Code gave any defendant in a felony case an option to demand a separate trial. When the present Criminal Rules were

adopted, the matter of separation of trials was left to the discretion of the trial judge. That the defenses of jointly indicted persons may be, in some respects, antagonistic or that the testimony of one or both of them may directly implicate the other are only factors for the trial judge to consider in making his determination as to whether the defendants will be prejudiced by a joint trial. If upon the consideration of the case a trial judge orders a joint trial, we cannot reverse unless we are clearly convinced that prejudice occurred and that the likelihood of prejudice was so clearly demonstrated to the trial judge as to make his failure to grant severance an abuse of discretion.

■ In the present case we do not find any abuse of discretion and we are not convinced that either Rachel or Boggs was prejudiced by the joint trial.

Both Rachel and Boggs contend the statements made by each of them prior to trial incriminated the other and the admission of those statements in evidence at the trial in which neither of them testified was error. Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

*Bruton* held that the admission into evidence of a confession of a defendant who did not testify at trial denied the right of confrontation to his codefendant in a case where the confession implicated the codefendant.

■ This case is distinguishable from *Bruton*. Boggs confessed to his part in the crime and never recanted. Rachel made a statement to the sheriff admitting his participation in the homicide but later made a statement to the state police detective in which he admitted his presence at the scene of the crime but denied any actual participation. He claimed his earlier confession was induced through fear of his codefendant.

In any event the statement of Boggs did not implicate Rachel in the crime to any greater extent than Rachel's own statement. Rachel's statement did not implicate Boggs to any greater extent than Boggs' own statement. Cf. Bunton v. Commonwealth, Ky., 464 S.W.2d 810 (1971); Taylor v. Commonwealth, Ky., 461 S.W.2d 920 (1970); United States ex rel. Catanzaro v. Mancusi, 404 F.2d 296 (2nd Circuit, 1968).

The state detective was permitted to read to the jury the statements of Rachel and Boggs from a thermofax copy rather than the original over defense objections that the copy was not the best evidence of the statement. There was no proof that the original was lost or destroyed.

At a hearing held out of the presence of the jury concerning the admissibility of the statements, the copies were inspected by defense counsel and no objection was made on account of the absence of the original statement. The officer who testified was present when the statements were given, and he testified that the thermofax copy was a true and exact copy of the original and that the copy was made from the original in his presence. Counsel for Boggs and Rachel do not suggest that the document in court was not a true and exact copy of the original document nor was any proof offered to that effect.

The reasons for the best evidence rule, dictated by common sense and long experience, were summed up by Wigmore as follows:

"As between a supposed literal copy and the original, the copy is always liable to errors on the part of the copyist, whether by wilfulness or by inadvertence; this contingency wholly disappears when the original is produced. Moreover, the original may contain, and the copy will lack, such features of handwriting, paper, and the like, as may afford the opponent valuable means of learning legitimate objections to the significance of the document. (2) As between oral testimony, based on recollection, and the original, the added risk, al-

most the certainty, exists, of errors of recollection due to the difficulty of carrying in the memory literally the tenor of the document."

4 Wigmore on Evidence, § 1179, Third edition.

Where a photo copy of the original is produced, there is no chance of a mistake upon the part of the scrivener in copying it, and exact replicas of handwriting and figures are produced. In the absence of some showing that the copy was altered or otherwise not an accurate copy —or that the watermark or quality of the original paper was an important evidentiary factor, there does not appear to be any real reason for distinguishing between a photo copy and a duplicate original although such a distinction prevails in most jurisdictions. Richardson, Kentucky Law of Evidence, Chapter 33.7 and 4 Wigmore, Evidence, § 1234; Chadbourn Revision, 1972.

KRS 289.091(8) provides that photo copies of certain commercial records shall be regarded as originals.

The admission of the thermofax copies under the circumstances of this case was not error.

Other alleged grounds of error have been carefully examined and we find that they are either (1) without merit or (2) have not been properly preserved for review.

The judgment is affirmed.

All concur.