# IMPORTANT NOTICE
# NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

# Supreme Court of Kentucky

2014-SC-000224-MR

**ROBERT THORNTON**          APPELLANT

|  | ON APPEAL FROM JEFFERSON CIRCUIT COURT |
|---|---|
| V. | HONORABLE CHARLES LOUIS CUNNINGHAM, JUDGE |
|  | NO. 08-CR-003866 |

**COMMONWEALTH OF KENTUCKY**          APPELLEE

## MEMORANDUM OPINION OF THE COURT

## AFFIRMING

A Jefferson Circuit Court jury found Appellant, Robert Thornton, guilty of seven counts of first-degree robbery. The jury recommended Appellant be sentenced to a total of twenty-four years' imprisonment, and the trial court sentenced him accordingly. Appellant now appeals as a matter of right, Ky. Const. § 110(2)(b), arguing the trial court erred in: (1) finding that Appellant lacked standing to challenge the warrantless global positioning system (GPS) tracking of a vehicle he drove, (2) denying Appellant's motion for a directed verdict as to some of his charges, and (3) only partially granting Appellant's motion to sever.

## I. BACKGROUND

Appellant was charged with forty-seven counts of first-degree robbery, one count of violating a protective order, one count of fleeing or evading police,

and one count of being a second-degree persistent felony offender (PFO). The Commonwealth ultimately dropped one of the robbery charges and the charge for violating a protective order; and, the trial court partially granted Appellant's motion to sever (such that he could only be tried jointly for offenses occurring within the same one-year period). As a result, Appellant was only tried for twelve of the first-degree robbery charges and for being a second-degree PFO. The jury convicted him of seven of the twelve robbery charges and acquitted him of the remaining five and of the PFO charge.

The events giving rise to Appellant's charges center around his alleged involvement in a series of robberies dating back to 2001 (though only tried for those occurring in 2008). Many of these robberies were captured on surveillance film and showed either one or two suspects entering places of business (restaurants in all but one instance), typically dressed in dark, baggy clothes and brandishing firearms. Several years into their investigation, Louisville Metro Police began to consider Kevin Sneed as a suspect. Without first obtaining a warrant, police placed GPS tracking devices on Sneed's vehicle, along with the vehicle belonging to his girlfriend, Kimberly Starks. After tracking the GPS signal emanating from the tracker attached to Sneed's vehicle to Appellant's apartment, police also considered Appellant as a suspect in the robberies.

Eventually, police used the GPS signal to catch Appellant and Sneed "red-handed" at the final robbery, leading to two high-speed police chases, Appellant being taken into custody, Sneed crashing a police car into the Ohio

2

River, and, ultimately Sneed being fatally shot by police after refusing to drop his weapon and put his hands up. More facts will be developed below as necessary for our analysis.

## II. ANALYSIS

### A. Fourth Amendment

The Fourth Amendment to the United States Constitution protects individuals against unreasonable searches and seizures; it reads: "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." Section 10 of the Kentucky Constitution provides similar guarantees: "[t]he people shall be secure in their persons, houses, papers and possessions, from unreasonable search and seizure . . . ." We have held "Section 10 of the Kentucky Constitution provides no greater protection than does the federal Fourth Amendment." *LaFollette v. Commonwealth,* 915 S.W.2d 747, 748 (Ky. 1996), *abrogated on other grounds by Kyllo v. United States,* 533 U.S. 27 (2001).

Appellant first argues that the trial court erred in finding that he did not have standing to challenge the warrantless GPS tracking of a vehicle he had permission to drive. In fact, however, the trial court merely found that Appellant did not have "standing to seek the shelter provided by [*United States v. Jones,* 132 S. Ct. 945 (2012)] and he did not have the type of possessory interest that protects against trespass," and went on to find that Appellant had no legitimate expectation of privacy—not that he lacked standing altogether. We will, therefore, address this matter as if Appellant were arguing that the

3

trial court erred in its denial of Appellant's motion to suppress, rather than as a question of standing. Furthermore, as the United States Supreme Court has held: "in determining whether a defendant is able to show the violation of his (and not someone else's) Fourth Amendment rights, the 'definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.'" *Minnesota v. Carter*, 525 U.S. 83, 88, (1998) (*quoting Rakas v. Illinois*, 439 U.S. 128, 140 (1978)).

Appellant insists that *United States v. Jones*, 132 S. Ct. 945 (2012) requires this Court to resolve the Fourth Amendment issue in his favor. We turn first to the facts of that case. In *Jones*, the police attached a GPS tracking device, *id.* at 947, to the undercarriage of a vehicle registered to Jones's wife, but driven exclusively by Jones. *Id.* at 949, n. 2. Justice Scalia, writing for the majority of the United States Supreme Court, framed the issue as: "whether the attachment of a Global–Positioning–System (GPS) tracking device to an individual's vehicle, and subsequent use of that device to monitor the vehicle's movements on public streets, constitutes a search or seizure within the meaning of the Fourth Amendment." *Id.* at 947. The Court made it clear that an important element of Jones's case was the fact that "[t]he Government physically occupied private property for the purpose of obtaining information." *Id.* at 949. In that case, the United States Court of Appeals for the District of Columbia had held that, since Jones was the vehicle's exclusive driver, the fact that it was registered to his wife had no effect on his Fourth Amendment claim. The government did not challenge that determination. Therefore, Jones's

4

status as the driver or owner of the vehicle was not before the United States Supreme Court. *Id.* at n. 2.

The *Jones* majority held that the "reasonable expectation of privacy" test set forth in *Katz v. United States*, 389 U.S. 347, 360 (1967) did not apply to Jones's case, as "Jones's Fourth Amendment rights do not rise or fall with the *Katz* formulation." *Jones*, 132 S. Ct. at 950. However, the majority went on to point out that: "[s]ituations involving merely the transmission of electronic signals without trespass would *remain* subject to *Katz* analysis." *Id.* at 953. Justice Scalia further articulated: "[i]t may be that achieving the same result through electronic means, without an accompanying trespass, is an unconstitutional invasion of privacy, but the present case does not require us to answer that question." *Id.* at 954. In summary, the *Jones* Court was faced with a case in which there was both trespass in order to attach the tracking system *and* subsequent transmission of electronic signals associated with the device.

A year after issuing its decision in *Jones*, the United States Supreme Court cited that case in *Florida v. Jardines*, 133 S. Ct. 1409, 1417 (2013) for the proposition that it need not analyze the case before it under *Katz*. In *Jardines*, police used a narcotics dog to investigate the constitutionally-protected area around Jardines' home. The government argued that no legitimate privacy interest was implicated as there was no reasonable expectation of privacy in the area the narcotics dog "sniffed." However, the United States Supreme Court disagreed with the application of the *Katz*

5

standard, as suggested by the government, and stated: "[t]he *Katz* reasonable-expectations test 'has been *added to,* not *substituted for,*' the traditional property-based understanding of the Fourth Amendment, and so is unnecessary to consider when the government gains evidence by physically intruding on constitutionally protected areas." *Jardines,* 133 S. Ct. at 1417 (*quoting Jones,* 132 S.Ct. at 951–952). The Court elaborated: "[o]ne virtue of the Fourth Amendment's property-rights baseline is that it keeps easy cases easy. That the officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred." The fact that the officers had physically trespassed upon the defendant's property was central to the *Jardines* holding.

This Court has also had occasion to examine the *Jones* holding. In *Hedgepath v. Commonwealth,* 441 S.W.3d 119, 125 (Ky. 2014), we recently pointed out that the holding in *Jones* was reached "under a trespass theory." In that case, police had the appellant's cell phone carrier ping his phone in order to determine its location. Since there was no physical trespass in *Hedgepath,* we indicated that, "[a]s to '[s]ituations involving merely the transmission of electronic signals without trespass,' the [United States] Supreme Court noted that they 'would *remain* subject to *Katz* analysis.'" *Id.* While we did not ultimately analyze this issue under *Katz,* as we held that the fruit-of-the-poisonous-tree doctrine was inapplicable, rendering any further analysis unnecessary, we still find our recent words instructive.

6

With this body of case law in mind, we must first determine whether a trespass occurred against Appellant in order to decide whether *Jones* is determinative of Appellant's issue. In the present case, Appellant neither owned the car in question nor was he the exclusive driver of the vehicle. The vehicles to which police attached the GPS tracking devices belonged to Appellant's alleged co-conspirator, Sneed, and Sneed's girlfriend, Starks. Appellant does not claim that the vehicles were under his control when police—admittedly acting without a warrant—attached the GPS tracking devices to them. Appellant did testify at trial that he had permission from the owners to drive the vehicles and that he did so periodically (sometimes alone when trying to throw Sneed's wife off his trail, as he was having an affair, and other times with Sneed in the vehicles with him) beginning months before the placement of the tracking devices. While claiming that *Jones* should apply, Appellant frames his arguement in terms of the *Katz* reasonable-expectation-of-privacy test. He never argues that a trespass occurred against *him* when police attached the GPS trackers to the vehicles. In *Jones*, a lower court had determined that the vehicle's registration did not affect Jones's ability to make a Fourth Amendment objection, and the government did not appeal that determination. Jones was the exclusive driver of the vehicle in question. Those are not the facts of this case.

Appellant does not claim that the vehicles were in his possession when police "physically occupied private property for the purpose of obtaining information." *Jones*, 132 S. Ct. at 949. By the very language of the Fourth

7

Amendment, "[t]he right of the people to be secure in *their* persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." (Emphasis added.) In order for Appellant's Fourth Amendment rights to have been violated by a police trespass, the "effects"—Sneed's and Starks's vehicles—would have to, at the very least, have been rightfully possessed by Appellant at the time of the GPS placement. Appellant does not make this claim. Thus, the police could not have been trespassing on *Appellant's* "effects" when they placed the GPS trackers on the vehicles. This highlights the problem with Appellant's argument. *Jones* only applies where there has been a trespass perpetrated against the individual claiming a Fourth Amendment violation in conjunction with "an attempt to find something or to obtain information," *id.* at 951, n. 5, and Appellant claims no such trespass. Because there was no trespass against Appellant, we disagree with his contention that *Jones* governs the case at bar. While it appears there was a trespass by police, it was not a trespass against Appellant and does not impact our analysis of this issue as to his Fourth Amendment rights.

Our analysis does not end with our determination that the police did not trespass against Appellant. Rather, the question still remains whether Appellant's Fourth Amendment rights were violated when police used the GPS tracking devices when Appellant was permissively operating the vehicles. Therefore, we will proceed to address this issue, as directed by the United States Supreme Court in *Jones*, under the *Katz* reasonable-expectation-of-privacy test. As the United States Supreme Court explained in *Rakas v.*

8

*Illinois,* "the Court in *Katz* held that capacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." 439 U.S. 128, 143 (1978) (*citing Katz,* 389 U.S. at 353; *United States v. Chadwick,* 433 U.S. 1, 7 (1977); *United States v. White,* 401 U.S. 745, 752 (1971)). Therefore, it falls to us now to determine whether Appellant had a reasonable expectation of privacy in Sneed's and Starks's vehicles while he was permissively operating them that was violated by the police's monitoring of signals from the GPS tracking devices.

After a robbery took place on December 8, 2008, police set up a "geo-fence" around Sneed's apartment complex and thereby received alerts anytime Sneed's or Starks's vehicles left the perimeter of the "fence." Detectives testified that, on December 14, police began live surveillance of the GPS tracking system attached to one of the cars after it left the perimeter. Police tracked the GPS signals to Appellant's apartment, and then to Wendy's. Two officers in the area saw two suspects wearing black approach the restaurant's back door, but then walk away. Again, on December 21, 2008, police tracked Starks's vehicle using the GPS signal after it left the perimeter of the geo-fence. In this instance, it was Appellant driving Starks's car. Appellant drove to Wendy's, which they allegedly robbed. Starks's car was spotted leaving the scene of the robbery. Detectives began converging upon the area and attempted to stop Starks's vehicle. However, Appellant fled, traveling at a high rate of speed and

9

running red lights. Eventually, police managed to stop the vehicle and arrested Appellant. Sneed managed to escape Starks's vehicle while police were apprehending Appellant and steal a marked Louisville Metro Police Department cruiser. After another high speed chase, Sneed crashed the car into the Ohio River, where police ultimately shot and killed him when he refused to put his hands in the air and drop his weapon.

Turning to United States Supreme Court precedent, we find *United States v. Knotts*, 460 U.S. 276 (1983), instructive. In *Knotts*, applying the *Katz* reasonable-expectation-of-privacy test, the Court held that the defendant's Fourth Amendment rights were not violated when police used a beeper placed inside a container of chloroform (with the consent of the seller) to obtain information about the location of a secluded cabin owned by the defendant (the purchaser of the chloroform) where they believed he was manufacturing methamphetamine. *Id.* Writing for the majority, Justice Rehnquist pointed out "that the Fourth Amendment's reach 'cannot turn upon the presence or absence of a physical intrusion into any given enclosure.'" *Knotts*, 460 U.S. at 280 (*quoting Katz*, 389 U.S. at 353). The *Knotts* Court relied on an earlier case, wherein the Supreme Court had elaborated on the *Katz* principles:

> Consistently with *Katz*, this Court uniformly has held that the application of the Fourth Amendment depends on whether the person invoking its protection can claim a "justifiable," a "reasonable," or a "legitimate expectation of privacy" that has been invaded by government action. . . . This inquiry, as Mr. Justice Harlan aptly noted in his *Katz* concurrence, normally embraces two discrete questions. The first is whether the individual, by his conduct, has "exhibited an actual (subjective) expectation of privacy," 389 U.S., at 361 . . . —whether, in the words of the *Katz*

10

majority, the individual has shown that "he seeks to preserve [something] as private." *Id.,* at 351 . . . The second question is whether the individual's subjective expectation of privacy is "one that society is prepared to recognize as 'reasonable,'" *id.,* at 361, . . . .—whether, in the words of the *Katz* majority, the individual's expectation, viewed objectively, is "justifiable" under the circumstances. *Id.,* at 353, 88 S.Ct., at 512.

*Smith v. Maryland,* 442 U.S. 735, 740-41 (1979) (footnote omitted).

The *Knotts* majority also relied on the plurality opinion in *Cardwell v. Lewis,* which stated: "[o]ne has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects. A car has little capacity for escaping public scrutiny. It travels public thoroughfares where both its occupants and its contents are in plain view." 417 U.S. 583, 590, (1974) (plurality). The *Knotts* Court ultimately held that "monitoring the beeper signals" did not "invade any legitimate expectation of privacy," *Knotts,* 460 U.S. at 285, as

> [v]isual surveillance from public places along [the route] would have sufficed to reveal all of these facts to the police. The fact that the officers in this case relied not only on visual surveillance, but on the use of the beeper to signal the presence of [the] automobile to the police receiver, does not alter the situation. Nothing in the Fourth Amendment prohibited the police from augmenting the sensory faculties bestowed upon them at birth with such enhancement as science and technology afforded them in this case.

*Id.* at 282.

We acknowledge that there is a difference between *Knotts* and the case at bar, in that the original owner gave consent for the placement of the beeper in *Knotts.* While the same is not true so far as Appellant is concerned, we believe

11

it is a distinction without a difference under the facts of this case. The ultimate question is still the same: since the police did not trespass against Appellant, we are only determining whether the GPS tracking device invaded his legitimate expectation of privacy. We hold that the police monitoring the GPS signals from Starks's vehicle as Appellant drove it in areas where "[v]isual surveillance from public places . . . would have sufficed to reveal" his location to police did not "invade any legitimate expectation of privacy." *Id.* Therefore, Appellant's Fourth Amendment rights were not violated and the trial court did not err in denying Appellant's suppression motion.

## B. Directed Verdict

Appellant next argues that the trial court erred by denying his motion for a directed verdict as to two of his first-degree robbery charges, claiming that the testimony concerning these robberies did not fit the modus operandi established by police and was inconsistent with the other robberies. Specifically, Appellant claims that the trial court should have granted a directed verdict as to the May 12, 2008, robbery at Buckhead, pointing out that the testimony presented by the Commonwealth on this charge included testimony that both robbers involved had black guns (rather than one black gun and one silver gun as was the case in the other robberies). Further, Appellant points to witness testimony that the shorter of the two robbers was 6' or 6'1"—in contrast to Appellant's height of 5'6".

Appellant also asserts that the trial court should have granted a directed verdict as to the September 15, 2008, robbery of a Family Dollar store, as this

was the only charge that did not involve a restaurant, thus placing it outside the modus operandi developed by police. Appellant points to the fact this was the only robbery in which the gun was pointed sideways "in a 'gangster' manner" and to the testimony that the gloves worn by at least one of the two robbers had finger portions cut off. Appellant alleges that these differences deviated from the other robberies to such an extent that it was error for the trial court to deny his motion for a directed verdict, as they were too dissimilar for the jury to rely on modus operandi in order to find him guilty.

We note that both of these robberies were caught on surveillance tape and that tape was admitted at trial. Therefore, the jury was not merely relying on the testimony of witnesses or on the modus operandi developed by police and presented by the Commonwealth. The only issue on these counts was identity: was Appellant one of the two robbers? It is important to note that, while the jury considered twelve counts of first-degree robbery against Appellant, it only convicted him of the seven in which there were either two individuals committing the robbery or there was a surveillance video of the event or both. The jury was able to compare the suspects in the videos in order to determine if they were the same person using such observations as their physical size, mannerisms, and clothing.

A trial court presented with a motion for directed verdict "must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth," and "assume that the evidence for the Commonwealth is true, but reserve[e] to the jury questions as to the credibility and weight to be given

13

to such testimony." *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991). "If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given." *Id.* On appellate review, a directed-verdict decision will be reversed only "if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt." *Id.* Applying these standards, we affirm the trial court's denial of a directed verdict on these two counts. It is not clearly unreasonable that a juror could believe that Appellant was one of the two robbers. The jury was not only reliant upon the modus operandi, but also had the benefit of the surveillance videos. This evidence was "sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty," *id.*, and the trial court did not err in so finding.

## C. Motion to Sever

Finally, Appellant argues that the trial court erred in only partially granting his motion to sever the robbery counts from one another. A Jefferson County Grand Jury indicted Appellant of 47 counts of robbery, occurring between December 2001 and December 2008, and all of the charges were initially set to be tried. Appellant moved the trial court to sever the counts into separate trials based on each robbery, arguing that having one large trial on all of the counts would confuse the jury, be unduly suggestive, and unduly prejudicial to Appellant. The trial court partially granted Appellant's motion to sever, ultimately allowing the Commonwealth to choose any twelve-month period and try only the robberies occurring in that time period. The

14

Commonwealth chose the twelve counts of robbery (and one count of fleeing and evading police) from 2008, the most-recent twelve-month period covered by the indictment.

Kentucky Rules of Criminal Procedure 6.18 permits offenses to be joined where "the offenses are of the same or similar character or are based on the same acts or transactions connected together or constituting part of a common scheme or plan." However, RCr 8.31 requires a trial court to order separate trials "[i]f it appears that a defendant or the Commonwealth is or will be prejudiced by a joinder of offenses . . . the court shall order separate trials of counts . . . or provide whatever other relief justice requires." This Court has recognized that "'prejudice' is a relative term" and, in the context of a criminal proceeding, means only that which is unnecessary or unreasonably hurtful, given that having to stand trial is, itself, inherently prejudicial." *Ware v. Commonwealth*, 537 S.W.2d 174, 176 (Ky. 1976); *Romans v. Commonwealth*, 547 S.W.2d 128, 131 (Ky. 1977). "We review the trial court's denial of a motion to sever for abuse of discretion . . . and the burden is on the appellant to show that the denial was in fact unfairly prejudicial." *Peacher v. Commonwealth*, 391 S.W.3d 821, 834 (Ky. 2013) (citing *Quisenberry v. Commonwealth*, 336 S.W.3d 19 (Ky.2011)); *see also Rachel v. Commonwealth*, 523 S.W.2d 395, 400 (Ky. 1975) ("If upon the consideration of the case a trial judge orders a joint trial, we cannot reverse unless we are clearly convinced that prejudice occurred and that the likelihood of prejudice was so clearly demonstrated to the trial judge as to make his failure to grant severance an abuse of discretion."). "The test for

15

abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky. 1999).

"[A] significant factor in determining whether joinder is proper is the extent to which evidence of one offense would be admissible in a trial of the other offense." *Id.* at 945. Appellant argues that "[w]ith the exception of the events of December 21, 2008—the Wendy's robbery and the subsequent fleeing and evading[—]the other robbery counts were different in character, separate in time, with no overlapping testimony or evidence." In order to determine whether evidence of one of the robberies would be admissible in a trial of another, we look to our evidentiary rules. Under KRE 404(b),

> [e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible:
>
> > (1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or
> >
> > (2) If so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party.

Appellant's identity was at issue, and the Commonwealth was tasked with proving that he was, indeed, one of the robbers. It set out to do so by proving that the crimes had a similar modus operandi, which we have held to be a permissible exception under KRE 404(b). In *Edmonds v. Commonwealth,* we held that to be admissible for this purpose, the acts "must generally be so

16

similar as to constitute a 'signature crime.' *See Commonwealth v. Maddox,* 955 S.W.2d 718, 722 (Ky. 1997); *Rearick [v. Commonwealth],* 858 S.W.2d [185,] 187-88 [(Ky. 1993)]." 189 S.W.3d 558, 563 (Ky. 2006). However, we did not end our analysis there. We went on in *Edmonds* to adopt the holding of Fifth Circuit Court of Appeals' case, to wit: "a number of common features of lesser uniqueness, although insufficient to generate a strong inference of identity if considered separately, may be of significant probative value when considered together." *United States v. Myers,* 550 F.2d 1036, 1045 (5th Cir. 1977); *see also Dickerson v. Commonwealth,* 174 S.W.3d 451, 468–71 (Ky. 2005).

In the case at bar, the twelve robberies were all committed within a seven-month period and under similar circumstances. Appellant points to some variations between the crimes in support of his argument for severance, but the robberies all involved one or two men entering businesses (restaurants in all but one occasion) and conducting "take-over" style robberies. The robbers typically (but not always) had the victims lie face-down, separated the manager from the group, demanded money from the safe, and asked for the surveillance video. As Appellant indicates, the modus operandi does not fit each and every one of the robberies. However, as our Court held in *Edmonds,* when taken together, the "common features of lesser uniqueness . . . may be of significant probative value when considered together," and, thus, the trial court's denial of Appellant's motion to sever was proper.

Even if we were to hold that evidence of the robberies would not be admissible in a trial for another, that factor's absence does not ring the death

17

knell to our analysis as to whether the trial court abused its discretion in denying a motion to sever. In *Brown v. Commonwealth*, our predecessor Court held:

> [t]he evidence of each crime was simple and distinct, the dates of the several offenses were closely connected in time, and even though such evidence of distinct crimes might not have been admissible in separate trials, the promotion of economy and efficiency in judicial administration by the avoidance of needless multiplicity of trials was not outweighed by any demonstrably unreasonable prejudice to the defendant as a result of the consolidations.

458 S.W.2d 444, 447 (Ky. 1970). Applying *Brown's* reasoning, we recently found "the scale to be tipped in favor of judicial economy. Put simply, [the appellant] has not met his burden of showing undue prejudice." *Carter v. Commonwealth*, No. 2011-SC-000060-MR, 2013 WL 658121, at *6 (Ky. Feb. 21, 2013).

In the case at bar, evidence of each of the robberies was simple and distinct and all the robberies occurred in a seven-month span. Appellant can show no unfair prejudice occurred by the denial of the motion to sever. The jury was able to distinguish one crime from the other, as evidenced by the fact that it acquitted Appellant on five of the twelve charged counts of first-degree robbery. The scale was "tipped in favor of judicial economy."

Appellant did not meet his burden of showing that the trial court's denial of his motion to sever the counts of robbery "was in fact unfairly prejudicial." *Peacher*, 391 S.W.3d at 834. We are not "clearly convinced that prejudice occurred and that the likelihood of prejudice was so clearly demonstrated to

18

the trial judge as to make his failure to grant severance an abuse of discretion."
*Rachel v. Commonwealth,* 523 S.W.2d 395, 400 (Ky. 1975.). Therefore, we hold that the trial court did not abuse its discretion in failing to fully grant Appellant's motion to sever.

## III. CONCLUSION

For the foregoing reasons, we affirm Appellant's convictions and corresponding sentences.

All sitting. VOTE!

COUNSEL FOR APPELLANT:

Robert Chung-Hua Yang, Assistant Public Defender

COUNSEL FOR APPELLEE:

Jack Conway, Attorney General of Kentucky
Bryan Darwin Morrow, Assistant Attorney General

# Supreme Court of Kentucky

2014-SC-000224-MR

ROBERT THORNTON                                              APPELLANT

                  ON APPEAL FROM JEFFERSON CIRCUIT COURT
V.                    HON. CHARLES LOUIS CUNNINGHAM, JUDGE
                           NO. 08-CR-003866

COMMONWEALTH OF KENTUCKY                             RESPONDENT

## ORDER GRANTING MODIFICATION AND DENYING PETITION FOR REHEARING

Thornton's Petition for Rehearing of the Opinion of the Court, rendered October 29, 2015, is DENIED. The Commonwealth's Motion for Modification of the Opinion of the Court, rendered October 29, 2015, is GRANTED. And the Opinion of the Court is substituted with the attached Opinion of the Court.

All sitting. All concur.

ENTERED: February 18, 2016.

                                        CHIEF JUSTICE